IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,

    Plaintiff,

vs.                    Case No. 11-40023-01-JTM

Caela M. White-Kinchion,

    Defendant.

MEMORANDUM AND ORDER

Following an extensive trial, the jury found Caela M. White-Kinchion guilty of twelve counts of health care benefit fraud, in violation of 18 U.S.C. § 1347, as well conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371. White-Kinchion served as the chief nurse for ProActive Health Services, an entity specializing in providing home nursing services to clients in the Wichita area.

The defendant has now moved for acquittal or, in the alternative, a new trial. (Dkt. 121). In addition, the defendant seeks leave under D.Kan.R. 47.1 to communicate with one of the dismissed alternate jurors. The court has reviewed the arguments of the parties, the evidence adduced at trial, and the relevant legal standards, and finds that the requested relief should be denied.

White-Kinchion does not discuss the relevant legal standards for motions for acquittal or new trial, and fails to demonstrate how the evidence was insufficient to support the verdict. She alleges, without any supporting analysis or elaboration, that the court erred in its conspiracy instructions and "[t]he evidence was insufficient to prove the government's case beyond a reasonable doubt." (Dkt. 121, at 5).

More specifically, White-Kinchion argues that the government did not prove a lack of medical necessity for services billed by ProActive, that the government failed to document its claim of "up coded charges" because "[t]he care plans certified by the physician provided for the appropriate codes as billed." (*Id*. at 2). Because these plans were supported by documents (known as 485 Forms) which were doctor-approved, White-Kinchion argues, the government's case was fatally flawed.

White-Kinchion further alleges that she was not involved in Pro-Active's billing process, and that there was no evidence she was engaged in "any global conspiracy" involving Pro-Active's patients (*Id*. at 3). She complains that nurse experts Lisa Landis, Tracey Wagner and Cheryl Scheol were allowed to testify, that the government was allowed to use a chart summarizing evidence while she was not, and that the court erred in allowing evidence relating to prior discipline against her by the Kansas Board of Nursing. Finally, she complains of the "frivolous and unprovable claims" advanced in the original Indictment, and that the court's restriction of argument to the issues framed by the Superseding Indictment "prejudiced her ability to proceed on her theory of the case; namely, that the government actually used the initial Indictment simply to pressure the

2

defendant into making statements against the actual targets of the government's investigation. (*Id*. at 1, 4-5).

In reviewing a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government. *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir.1999). The court must grant a motion for judgment of acquittal when the evidence is insufficient to sustain a conviction. Fed.R.Crim.P. 29(a). On the other hand, the court must uphold the jury's guilty verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haber*, 251 F.3d 881, 887 (10th Cir.2001) (citation and quotation marks omitted) (emphasis in original). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir.2000) (citation and quotation marks omitted). Simply put, the court must "'ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [the defendant] guilty beyond a reasonable doubt.'" *United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir.2005) (quoting *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir.2003)) (alterations added). If the government's proof meets this standard, the court must defer to the jury's verdict. *Id.*

Under Fed.R.Crim.Pr. 33, the court may grant a motion for new trail "if the interest of justice so requires." Such a motion is not regarded with favor and is granted with great caution. *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir.2007); *United States v.*

*Trujillo*, 136 F.3d 1388, 1394 (10th Cir.1998). The court may weigh the evidence and assess witness credibility. *United States v. Quintanilla*, 193 F .3d 1139, 1146 (10th Cir.1999) (citation omitted). The court should grant a motion for a new trial if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir.1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir.1994)).

The court accurately instructed the jury as to the elements of the conspiracy charge advanced in the Superseding Indictment. In addition, the jury's conspiracy verdict is supported by substantial and sufficient evidence. The jury heard evidence showing that Pro-Active's nurses or health aides frequently falsely billed Medicare for services which were not provided to clients. Several former Pro-Active nurses or aides testified that they falsified bills, and that White-Kinchion, the head nurse at Pro-Active, both knew of these false billings and indeed directed them. White-Kinchion directed these witnesses, if they could not locate the assigned Pro-Active patient, to avoid mentioning this in patient documents, as it might endanger the benefits flowing to Pro-Active. As one of the witnesses testified, when her medical notes indicated that one of her disturbed patients refused to answer the door, White-Kinchion told her to "write that damn note," and thus to falsely to indicate that services were provided. Numerous witnesses, including Hobart Jordan, Michelle Levy, Tracy Queros, Rebecca Baca, and Trina Wilson testified that White-Kinchion, even if not technically a part of the Pro-Active billing process, nevertheless

specifically directed and instructed the other nurses at Pro-Active in how to bill.

As the chief nurse at Pro-Active, White-Kinchion played an integral role in the conspiracy. She needed the subordinate nurses to carry out the scheme of false billings for missed visits, and the subordinate nurses depended on White-Kinchion to co-ordinate the visits and provide guidance. It was White-Kinchion who authorized the subordinate nurses to record falsely the "actual time" of their visits in sixteen-minute increments as a means of maximizing the compensation paid to Pro-Active. The evidence supported the jury's verdict on the conspiracy charge.

With respect to health care fraud charges (Counts 2-13), there was ample evidence to show that the defendant knowing and willfully participated in a scheme to defraud a health benefit program. The testimony of Jordan, Levy, Queros, Baca and Wilson supports the conclusion that White-Kinchion was in charge of Pro-Active's scheduling and gave instructions in the documentation and "mapping" of patient visits for billing purposes. The defendant played an essential and integral role in fraudulent billing. In addition to the testimony of the co-conspirator subordinate nurses, the jury heard evidence from specific clients, or their relatives, that Pro-Active's billings were false and fraudulent because the services were never provided. In some instances, the witnesses stated that they provided the services, such as insulin injections, claimed by Pro-Active. In other instances, the services simply could not have been provided because, at the "actual time" Pro-Active allegedly delivered its home nursing service, the client was in the hospital or incarcerated.

The defendant's request for new trial is also deficient. As noted earlier, the

5

defendant argues that the government's case was defective. In advancing this argument, the defendant refers to her "earlier motion and memorandum on this issue filed prior to commencement of the trial," and complains that "the government proceeded to present evidence on such matters without any justification to do so and contrary to the rights of the defendant." (Dkt. 121, at 2). That motion argued (a) that medicaid gave its prior authorization to these procedures, or the procedures were approved by doctors, (b) that all the actions were taken by ProActive employees other than her, (c) and that no expert has been presented who will testify that the services were not medically necessary.

The court will address below the substance of defendant's "medical necessity" argument, but notes here that the complaint of prejudice at the court's taking the motion under advisement is wholly without merit. The defendant's motion (Dkt. 108) was presented prior to trial only in the narrow sense that it was electronically submitted a few minutes before the first witness began to testify. It was submitted after the jury was empaneled and opening statements made. The motion sought either dismissal of "claims ... based on the lack of medical necessity," or alternatively an exclusion of evidence on the issue because of a supposed lack of expert testimony. To the extent defendant sought a dispositive resolution of the government's charges, the motion was premature and appropriately considered after the government had a chance to present its evidence. To the extent defendant sought exclusion of the government's evidence, it was essentially a motion *in limine* submitted over a week after the court-ordered deadline for such motions.

Finally, the defendant never sought any express ruling on the Motion to Dismiss or

Exclude. To the contrary, when the defendant moved for acquittal at the conclusion of the government's evidence, counsel referenced the earlier Motion to Dismiss or Exclude, noting that "we are adopting that, that's part of our [current] motion." When the court indicated it would take the combined motion under advisement, counsel stated, "I am not asking for a ruling, I'm just fine with your pronouncement there."

The dispositive motion submitted by the defendant during the trial was without merit; the fact that Medicaid may have initially approved payment of a claim is not decisive, if the approval was grounded on fraudulent or misleading documents. The court determined at the time of the Motion to Dismiss or Exclude that the question of approval of the services by doctors was question of proof, particularly in light of evidence adduced in conjunction with the *in limine* motions that some physician signatures in the Pro-Active records were not genuine. Notably, with respect to the supposed lack of expert witnesses on the issue of medical necessity, the defendant's argument was entirely conclusory (occupying only a single sentence in her brief), and making no attempt whatsoever to review the government's numerous proposed expert witnesses to explain why such testimony would be inadmissible.

More broadly, none of the authorities cited by the defendant in the Motion to Dismiss or Exclude deal with the relevant health care fraud criminal statute, 18 U.S.C. § 1347. Instead, the cases cited by defendant (Dkt. 108, 1-3) involve discussions of "medical necessity" under a wide variety of other contexts. *See Stenberg v. Carhart*, 530 U.S. 914 (2000) (discussing medical necessity in the context of a woman's right to abortion); *Nold v. Binyon*,

272 Kan. 87, 100-01, 31 P.3d 274 (2001) (observing generally that, under Kansas law, a nurse works under a doctor's supervision); *Stinemetz v. Kansas Health Policy Authority*, 252 P.3d 141, 152-153, 45 Kan.App.2d 818 (2011) (administrative appeal of state agency's denial of a liver transplant under Kansas state law).

Second, while the Superseding Indictment does include claims that the services were provided without medical necessity, that was not the only theory of the government's case. Simply put, a lack of medical necessity is not an essential element of § 1347. Rather, it is simply one alternate theory of how claims might be considered fraudulent. "The essential elements of health care fraud are (1) a scheme or artifice to defraud or to obtain by false or fraudulent pretenses; (2) with the requisite intent — knowing and willful execution or attempted execution of the scheme; (3) for the payment of money; (4) from a health care benefit program." *United States v. Convalescent Transports, Inc.*, 2007 WL 2090210 (E.D.N.C. 2007).

In *United States v. Davis*, 490 F.3d 541 (6th Cir. 2007), a criminal action under § 1347 for the submission of false Certificates of Medical Necessity (CMN) forms in supplying oxygen to coal miners suffering from black lung disease, the defendant alleged that the trial court erred in refusing to allow evidence that the oxygen was medically necessary. The Eighth Circuit held that it was not error to exclude the evidence, because § 1347's prohibition of false claims is broader than actual lack of medical necessity. This is because "the medical necessity of the product or service ultimately obtained is not the crux of the issue, but rather the total integrity of the CMN forms." *Id.* at 546. *See also United States v.*

*Nekritin*, 2012 WL 37536, (E.D.N.Y. 2012) ("whether or not the government proved the defendants' guilt under its 'medical necessity' theory, the verdict must stand because … the evidence was sufficient to support the government's theory that the … procedures were not performed"); *United States v. De Los Rios*, 2011 WL 346087, *5 (S.D. Fla. 2011) (evidence of medical necessity could be relevant to issue of defendant's fraudulent intent, but noting that "the statutes under which defendants are charged do not contain medical necessity as an element" of § 1347).

Further, at the time of the defendant's Motion to Dismiss filed on the second day of trial, it appeared to the court that the lack of medical necessity was not simply an alternative theory of the underlying fraud, but a discarded one, as the requested instructions previously filed by the government (Dkt. 100) abandoned any use of the term "medical necessity."

That term is also absent from the court's instructions given to the jury. These instructions were approved following an instruction conference in which the term "medical necessity" was not mentioned (other than, as noted earlier, the bare notation that the earlier Motion to Dismiss or Exclude based on that subject remained under advisement). defendant made no attempt to have "medical necessity" added as an element to the instructions. Indeed, Instruction 16, which sets forth the necessary elements for the § 1347 fraud claims, was amended at the defendant's request to require that proof that White-Kinchion submitted false claims "for home health services that were not provided."

The court therefore rejects defendant's "medical necessity" argument for two

reasons. First, it fails in light of the evidence presented at trial. Simply because there is a doctor's signature in the ProActive file doesn't establish that a given service was in fact medically necessary. Dr. Mickey Myrick affirmatively testified that some of the signatures were not his. Other evidence indicated that White-Kinchion showed others how to manipulate the office printer to create a forged signature.

But even assuming many of the signatures were genuine, and thus a physician had indeed approved the delivery of specific nursing services to specific Pro-Active clients, this is no defense if those services were never in fact provided. That is, this is not a case where the fraud arises because services were delivered which were not needed, but because services, even if needed, were not delivered.

The court finds, as discussed earlier, that substantial evidence supports the jury's findings as to the conspiracy and health care fraud charges. The defendant has failed to point to any circumstances which would justify a new trial on any of these charges. With respect to the defendant's contention that she was not involved in the ProActive billing process, there is substantial evidence showing that the defendant played a central and coordinating role in the fraudulent billing scheme. There is evidence that the defendant aided, assisted, and directed the "up coding" of services, that is, the billing of services greater than those that were actually delivered. Under the defendant's direction, the subordinate nurses turned in false visit notes with false beginning and ending "actual times" — all designed to reach the additional Medicaid billing increment of sixteen minutes.

Similarly, there is substantial evidence in support for the finding that ProActive services were not delievered pursuant to legitimate 485 Forms. Dr. Mickey Myrick affirmatively testified that many signatures in the ProActive records were not his. Although the defendant presented a questioned documents expert to challenge Dr. Myrick's testimony, the issue was one which the jury could appropriately resolve either way. For purposes of the present motion, however, it is important to note that the allegation of falsified 485 Forms was not limited to Dr. Myrick's testimony. White-Kinchion's subordinate nurses testified directly that White-Kinchion was involved in the creation of false documentation. Michelle Levy testified that she observed White-Kinchion show how to use a computer to separate a physican's signature from the rest of a document, clearly for the purpose of pasting it into other documents. Rebecca Baca testified that White-Kinchion showed her how she (White-Kinchion) was able to forge Dr. Myrick's signature.

As noted earlier, White-Kinchion argues that the court erred in allowing three nurse experts, Lisa Landis, Tracey Wagner and Cheryl, to testify "beyond the disclosure notice provided [and] beyond the scope of their expertise." (Dkt. 121, at 3). Other than this bare conclusion, White-Kinchion points to no argument or examples of specific testimony which was erroneously admitted.

The government made proper disclosures of the testimony of Landis, Wagner, and Schell. (Dkt. 48, at 3, 6). The government disclosed that Schell, Wagner, and Landis would testify to the false representations in ProActive billings, the up coding of claims, and

medical necessity. In addition, Wagner would provide additional testimony about Medicaid billing practices. All three witnesses are registered nurses who have extensive experience in direct clinical settings and as consultants. In the latter role, Landis and Schell have experience creating case reviews to evaluate the medical necessity of services, quality of care provided, and adherence to program guidelines. Wagner has supervised the Kansas Medicaid fraud and abuse department and has developed case reviews of Medicaid providers.

Prior to trial, the defendant sought to exclude the complete exclusion of all the government's proposed expert witnesses on various grounds. As in the present motion, White-Kinchion argued with respect to Schell, Wagner, and Landis that the proposed testimony could not be relevant because she played no role in the billing process at ProActive. The court denied defendant's motion, finding that the government had complied with the requirements of Fed.R.Crim.Pr. 16(a)(1)(G). With respect to White-Kinchion's actual role at ProActive, the court determined this was a factual issue, and that the government might supply such evidence from other witnesses. As noted above, there is substantial evidence from multiple witnesses to the effect that White-Kinchion played a central and coordinating role in the false billing scheme operated at ProActive.

To the extent the government's evidence went beyond that proposed by the government[1] or beyond their established expertise, the court excluded the testimony and

---

[1] With respect to the lack of full and timely disclosure under Rule 16, the court would note that the defendant has not sought its consistent application. Over the government's objection, the court allowed defendant to offer the testimony of a

carefully charged the jury not to consider it. In particular, the court determined that the government had failed to support its claim that ProActive's failure to provide nursing services had resulted in serious bodily injury to the patient known as Rose. The testimony actually offered by the government was both beyond the scope its Rule 16 disclosure, the court also determined that Landis lacked the expertise to testify to medical causation,[2] and because her testimony in any event was simply equivocal.[3] The court carefully instructed

---

handwriting expert to rebut the testimony of Dr. Myrick,

[2] *See Vaughn v. Mississippi Baptist Med. Ctr.*, 20 So.3d 645, 652 (Miss. 2009) (summarizing cases and accepting "the majority rule that nursing experts cannot opine as to medical causation and are unable to establish the necessary element of proximate cause").

[3] Rose died after she was found on the floor of her home by her daughter and admitted to the hospital suffering from spesis, urinary tract infection, and severe dehydration. Hospital admission records showed that Rose had suffered from nausea and vomiting with diarrhea for two weeks — two weeks during which she was supposed visited twice daily by ProActive's nurses. The ProActive records show that Rose was in normal condition, with no vomiting or diarrhea.

Landis testified that the hospital records showed that the renal failure was acute, in the sense that it had recently occurred. She testified that renal failure is "a serious condition," and agreed to the question posed by counsel that the condition "if left untreated can … cause death." She testified that the severe hydration and renal failure were "bodily injuries … that put Rose at substantial risk of death."
However, Landis did not directly testify that the missed visits actually *caused* the dehydration or kidney failure. When counsel asked her precisely that question, she balked:

> Q. Based on -- based on your review, have you formed an opinion about whether, as you put it, the horrible care by Proactive contributed to Rose's severe dehydration and kidney failure?
>
> A. Absolutely.

the jury as to the evidence it might consider, and the defendant has completely failed to point to any specific evidence which was erroneously admitted or which created unfair prejudice.

White-Kinchion contends that the court erred in allowing a government authorized summary of chart of the exihbits to be utilized by the jury, while at the same time precluding the defendant from using a comparable chart, her proposed Exhibit 9A. No error exists. The underlying exhibits, comprising voluminous medical records, were admitted by stipulation. Notably, the defendant makes no showing that the government's summary of the exhibits was in any way misleading or unfair. In contrast, the court properly excluded the defendant's Exhibit 9A, since the document was not a simply

---

> Q. And what is your opinion?
>
> A. My opinion is that Rose, um, was found on the floor of her -- of her home by her daughter and if she hadn't have stopped by or checked on her, on her mom, then I have no confidence at all that all of a sudden she would have felt better; that she would have gotten better; that she would have been able to get up off that floor.
>
> So although -- *although Proactive may not have -- their lack of care to not provide any care may not have -- she may not be here with us today, I mean, her cancer was aggressive and invasive*, but she did deserve to be safe and protected in her own home. And she did deserve to be comfortable. And she did deserve dignity. And she didn't get any of that.

(Emphasis added). On the central issue of causation, Landis's testimony was simply insufficient, and acknowledged that Rose suffered from an "aggressive and invasive" cancer. The evidence fails to address the possibility that such a cancer might independently cause dehydration or renal failure. Asked directly about the issue, Landis retreated into generalities about Rose's right to comfort and dignity.

summary of evidence, but included additional arguments and comments of counsel. These observations were not directly grounded in the evidence, and could not be considered a simple "summary" of the evidence.

The court did not err in allowing limited testimony as to the decision of the Kansas Nursing Board to impose discipline on the defendant in 1998, based upon her falsification of another person's signature in medical records. The evidence was properly admitted to show intent, knowledge, plan, or absence of mistake. In addition, the evidence was introduced in conjunction with a careful limiting instructions.

Finally, the defendant complains that she was not permitted to make reference or argument relating to the original Indictment during the trial. That is, it precluded her from presenting "her theory of the case; namely, that the government actually used the initial Indictment simply to pressure the defendant into making statements against the actual targets of the government's investigation." (Dkt. 121, at 4-5). The defendant advances no authority for inferring that any of the charges in the original Indictment lacked validity.

A "superseding indictment" is a second indictment which is returned without the dismissal of the first. *United States v. Rojas-Contreras*, 474 U.S. 231, 237, 106 S.Ct. 555, 558, 88 L.Ed.2d 537 (1985) (Blackman, J., concurring). A superseding indictment may be returned at any time before a trial on the merits of an earlier indictment. *United States v. Herbst*, 565 F.2d 638, 643 (10th Cir.1977). The government has the ability to select which indictment will form the basis for the trial. *United States v. Bowen*, 946 f.2d 734, 736 (10th Cir. 1991) (citing *United States v. Stricklin*, 591 F.2d 1112, 1115-16 n. 1 (5th Cir.), *cert. denied*,

444 U.S. 963 (179). This freedom is circumscribed only if the timing of the superseding indictment is prejudicial to the defendant. *See United States v. Begay*, 602 F.3d 1150, 1154-55 (10th Cir. 2010) ("it was entirely proper for the government, absent prosecutorial vindictiveness or prejudice to Begay, to alter its tactics in response to the rulings on its proffered Rule 414 evidence and seek a superseding indictment").

Prior to trial, the defendant moved to compel the production of certain grand jury testimony, based on perceived differences in the two indictments. The court denied the requested relief, observing that the Superseding Indictment narrowed the allegations against the defendant, and otherwise no indication of prejudice:

> [T]he new Indictment does not add any new allegations with respect to the charges against White-Kinchion. The court has reviewed the First Superseding Indictment and finds that it does not advance any novel claims or contentions which were not made in the preceding Indictment.

(Order, Dkt. 83, at 2).

As indicated earlier, "[i]t is well established that the government has wide latitude to obtain a superseding indictment at any time prior to trial, and may then select the indictment under which to proceed at trial." *See United States v. Fisher*, 692 F. Fupp. 495, 499 (E.D.Pa.1988) (collecting cases). The defendant's argument here would reverse this rule, giving a defendant the right to decide which indictment to defend. The defendant presents no authority for this position, and the court finds no error in limiting the trial to the issues framed by the Superseding Indictment.

Finally, in addition to the motion for acquittal or new trial, the defendant has also

moved for leave to contact one of the jurors, an alternate who was dismissed at the conclusion of the trial. According to the defendant, she met the alternate juror at a local supermarket. The alternate juror

> provided defendant with information based on conversations between the jurors that allegedly took place during the course of the trial which raise concern whether the jurors followed the Court's admonitions safeguarding defendant's right to a fair trial. In addition, Ms. Bland informed defendant that she desired to both attend defendant's sentencing and to communicate with the Court on defendant's behalf.

(Dkt. 126, at 1).

The court hereby denies the defendant's requests with respect to the alternate juror. The defendant's pleading, which suggests that some jurors may have discussed aspects of the case prior to formal deliberations, presents no claim of improper external influence on the jury.

> A distinction may be drawn between extrinsic or extraneous influences and intrinsic influences on the jury's deliberations. Extrinsic or extraneous influences include publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and outside persons. Extrinsic or extraneous influences may be grounds for impeaching a verdict. Intrinsic influences include discussions and even intimidation or harassment among jurors. Intrinsic influences on a jury's verdict are not competent to impeach a verdict.

*United States v. Bassler*, 651 F.2d 600, 602 (8th Cir. 1981) (citation omitted).

The court declines to grant the relief sought given (a) the failure of the defendant to demonstrate any improper influence upon or prejudice by the jury, (b) the failure of the dismissed alternate juror to make any timely report of the (supposed) premature

17

deliberations, (c) the careful, considered, and extended nature of the actual deliberations, and (d) the post-trial juror discussions, expressly authorized by the court pursuant to Rule 47.1, which attended by both counsel and officers of the court, which were completely devoid of any suggestion of improper conduct or unfair prejudice. The court also takes into account the strong policy limiting inquiry into the jury's deliberations. *See Tanner v. United States*, 483 U.S. 107, 120-21 (1987), Fed.R.Evid. 606(b).

Given the speculative nature of the suggestion of bias, and the failure to present any indication of premature deliberations until many weeks after the trial, the court finds that the relief should be denied. On much stronger facts, the Seventh Circuit affirmed the decision of the district court to deny an evidentiary hearing, stressing that the claim of prejudice was "sheer speculation." *United States v. Morales*, 655 F.3d 608, 630 (7th Cir. 2011). Similarly, in *United States v. McElhiney*, 85 Fed.Appx. 112, 115 (10th Cir. 2003), the Tenth Circuit found it was no abuse of discretion in the decision of the district court to refuse to interview jurors charged with premature deliberations, given the court's finding defendant had not showed either "that the jury acted unfairly or that the deliberative process was unfair."

To the extent that the defendant's motion also suggests the appearance of the dismissed alternate juror at the sentencing, the request is similarly denied. During voir dire, the dismissed alternate juror affirmatively denied knowledge of the facts of the case. As such she could have no knowledge of relevant facts not presented during the trial.

As a member of the public, Ms. Bland has the right to attend the sentencing, but the

court will not hear from her concerning any matter.

IT IS ACCORDINGLY ORDERED this 20th day of September, 2013, that the defendant's Motion to Dismiss or Exclude (Dkt. 108), Motion for Acquittal or for New Trial (Dkt. 121), and Motion to Communicate (Dkt. 126) are hereby denied. The previous motions *in limines* of all parties (Dkt. 54, 68, 75) are granted in part and denied in part as reflected in the hearings conducted prior to trial; the government's Motion for Deposition (Dkt. 73) is denied as moot.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE